UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

XENGXAI YANG,

            Petitioner,

     v.                                  Case No. 21-C-1281

UNITED STATES OF AMERICA,

            Respondent.

## DECISION AND ORDER DENYING § 2255 MOTION TO VACATE JUDGMENT

      Xengxai Yang is currently serving a 168-month sentence for armed bank robbery and related offenses. On November 5, 2021, he filed a timely petition under 28 U.S.C. § 2255 to vacate his conviction on the ground of ineffective assistance of counsel. With the assistance of counsel, Yang filed a second amended petition in which he withdrew his claim for ineffective assistance of counsel and alleged that he had been denied due process by the failure to conduct a hearing to determine whether he was competent to proceed to trial in the underlying action. The court held an evidentiary hearing on February 9, 2023, and ordered post-hearing briefing. Yang filed a post-hearing brief, to which the Government filed a response, and Yang filed a reply. The matter is now ripe for review. For the reasons set forth below, the court concludes that Yang's due process claim is procedurally defaulted. The court further concludes that, even if the claim was not procedurally defaulted, it fails on its merits. Accordingly, Yang's petition for relief under § 2255 will be denied.

## THE UNDERLYING CRIMINAL CASE—CASE NO. 19-CR-67

Shortly before 6:00 p.m. on March 15, 2019, nineteen-year-old Xengxai Yang walked into the Community First Credit Union in Appleton, Wisconsin, wearing a black plastic theater mask, sunglasses, and a black sweatshirt with a hood covering his head, and carrying a sawed-off semiautomatic .22 caliber rifle. Yang pointed the rifle at a teller and the on-duty branch manager while another teller assisted a customer at the drive-up window. Case No. 19-CR-67, Presentence Investigation Report, Dkt. No. 45, ¶ 17. When that customer transaction was completed, Yang chambered a round into the rifle and ordered the tellers to give him the money from their respective cash drawers. He then placed the money from the drawers in a nylon drawstring backpack, restrained two of the employees with cable ties, and walked out the doors. *Id.* ¶ 18.

Alerted to the robbery by a customer waiting in the drive-up lane, Appleton police promptly responded and located Yang walking on a near-by street about a block from the credit union. He was still wearing the theater mask, sunglasses, and hooded sweatshirt and carrying the sawed-off rifle. Officers located on his person two additional loaded magazines for the rifle, a 100-round box of .22 ammunition, the nylon drawstring backpack containing $10,745 in U.S. currency, and black plastic cable ties. *Id.* ¶ 19. Yang was placed under arrest and transported to the Appleton Police Department where, after being advised of his *Miranda* rights, he underwent an extensive video-recorded interview and admitted robbing the credit union. When questioned about his motive, Yang stated, "I decided to try something new today, so I robbed the bank." *Id.* ¶ 20.

On April 16, 2019, Yang was charged in an indictment with armed bank robbery, in violation of 18 U.S.C. §§ 2113(a) and (d) (Count One); brandishing a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and (B)(i) (Count Two); and unlawful possession of a firearm, in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d), and 5871 (Count

2

Three). Case No. 19-CR-67, Dkt. No. 1. Yang's family retained Attorney Kevin Musolf to represent him, and at his arraignment Yang entered pleas of not guilty. The case was set for trial to commence on July 1, 2019. On June 11, 2019, Yang filed a Notice of Insanity Defense pursuant to Federal Rule of Criminal Procedure 12.2(a). The court then removed the case from the trial calendar and ordered a psychological evaluation pursuant to 18 U.S.C. § 4247(c) to be performed by Dr. Kent Berney, a psychologist licensed by the State of Wisconsin.

Based upon his evaluation, Dr. Berney concluded that Yang did not meet the legal definition of insane at the time of the offense. Case No. 19-CR-67, Dkt. No. 13. From his testing and clinical interview, Dr. Berney found that "Mr. Yang clearly engaged in malingering during [his] examination, primarily related to memory defect." Despite this finding, however, Dr. Berney stated he could not rule out a "neurological anomaly which would be consistent with a severe mental defect." *Id.* at 14. Nevertheless, Dr. Berney stated that it was his opinion "to a reasonable degree of psychological certainty, that Mr. Yang does not experience a severe mental disease that would be appropriate for consideration of an insanity defense." *Id.* at 15. In Dr. Berney's opinion, "Mr. Yang did appreciate the wrongfulness of his acts." *Id.*

After reviewing Dr. Berney's report, Yang withdrew his insanity defense and entered into a Plea Agreement with the Government. Case No. 19-CR-67, Dkt. No. 15. On January 17, 2020, pursuant to that Agreement, Yang entered pleas of guilty to Armed Bank Robbery (Count One) and Using a Firearm in furtherance of a Crime of Violence (Count Two), and sentencing was set for April 13, 2020.

On February 6, 2020, Yang wrote to the court asking for a new attorney and to withdraw his guilty pleas. Yang claimed in his handwritten letter that his attorney had not reviewed Dr. Berney's report with him and in general ignored his questions about his case. As a result, he

3

claimed that his plea was neither voluntary nor intelligent. Case No. 19-CR-67, Dkt. No. 17. At a hearing on Yang's request, Attorney Musolf disputed Yang's claim that he did not discuss Dr. Berney's report with him but acknowledged that Yang no longer had confidence in him and asked to withdraw. The court granted Attorney Musolf's motion and directed that a new attorney be appointed under 18 U.S.C. § 3006A with the understanding that, after reviewing the file and consulting with Yang, counsel would decide whether to move for withdrawal of his pleas.

Attorney Thomas Phillip was appointed to represent Yang and entered his appearance on February 19, 2020. Attorney Phillip arranged for Dr. Denver Johnson, also a psychologist licensed by the State of Wisconsin, to conduct a neuropsychological evaluation of Yang. Based on his evaluation, Dr. Johnson concluded "to a reasonable degree of certainty that the multiple mental conditions that Mr. Yang was experiencing at the time of the crime seriously impaired his judgment and the ability to appreciate the nature and quality of as well as the wrongfulness of his acts." Case No. 19-CR-67, Dkt. No. 29-1 at 36. Based on Dr. Johnson's report, Attorney Phillip filed, on Yang's behalf, a motion to withdraw Yang's guilty pleas and reassert his insanity defense. Case No. 19-CR-67, Dkt. No. 27. The court granted Yang's motion over the Government's objection, concluding that Yang had shown a fair and just reason for the withdrawal. Case No. 19-CR-67, Dkt. No. 34.

Yang waived his right to a jury and, with the Government's consent, a trial to the court was held on October 29, 2020. The parties stipulated to the surveillance video from the credit union that showed Yang entering the building and completing the robbery. Case No. 19-CR-67, Trial Ex. 4. The parties also stipulated to the video of Yang's post-arrest interview at the Appleton Police Department. *Id.* The only issue in dispute was whether Yang was legally insane at the time of the crime. Both Dr. Berney and Dr. Johnson testified as to that issue. Case No. 19-CR-67, Dkt.

No. 61. At the conclusion of the trial, the court found that Yang had failed to establish that, at the time of the robbery, he suffered from a mental disease or defect of such severity that he was unable to appreciate the nature and quality or the wrongfulness of his acts and found him guilty on all counts. *Id.* at 97–102. On February 5, 2021, the court imposed concurrent sentences of 48 months on Counts One (bank robbery) and Three (unlawful possession of a firearm) and 120 months as to Count Two (brandishing a firearm during a crime of violence), which was ordered to run consecutive to Counts One and Three, for a total of 168 months (14 years) imprisonment and a total of five years of supervised release. Judgment was entered that same day.

Yang did not appeal his conviction. Instead, on November 5, 2021, he filed a pro se motion to vacate his conviction under 28 U.S.C. § 2255, in which he claimed that Attorney Phillip had provided ineffective assistance of counsel by rejecting his earlier plea agreement and proceeding to trial on the defense of insanity. The court concluded that an evidentiary hearing was necessary to resolve Yang's petition and appointed counsel as required under Rule 8(c) of the Rules Governing § 2255 Proceedings. Attorney Catherine White entered her appearance on June 14, 2022, and the court set the matter for an evidentiary hearing on September 1, 2022. Attorney White later moved to adjourn the hearing and then sought leave to file a second amended § 2255 petition. Both motions were granted, and on October 25, 2022, Attorney White filed an amended petition on Yang's behalf which withdrew Yang's original claim of ineffective assistance of counsel and in its place alleged that the court's failure to hold a competency hearing during his criminal proceedings violated Yang's right to due process of law. The evidentiary hearing was finally held on February 9, 2023. The court's findings of fact and conclusions of law are set forth in the following analysis.

The Due Process Clause prohibits the trial and conviction of mentally incompetent defendants. *Drope v. Missouri*, 420 U.S. 162, 172 (1975). Courts have drawn a distinction between procedural competency claims and substantive competency claims. "A petitioner may make a procedural competency claim by alleging that the trial court failed to hold a competency hearing after the defendant's mental competence was put at issue." *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995); *see Pate v. Robinson*, 383 U.S. 375, 385 (1966) ("The failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial."). A substantive competency claim, on the other hand, is made by alleging that, even though there was no procedural error, "[the petitioner] was, in fact, tried and convicted while mentally incompetent." *Medina*, 59 F.3d at 1106; *see also Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005).

 Yang has asserted both kinds of claims here. He contends that, despite his "bizarre behavior, recent diagnosis of a psychotic disorder, and long history of neurocognitive limitations, including an IQ below the first percentile, no one requested a competency evaluation during his criminal proceedings." Case No. 21-CV-1281, Dkt. No. 43 at 9. He asserts that, because the evidence demonstrates a bona fide reason to doubt his competence during the period in which he was tried, convicted, and sentenced, the court should have *sua sponte* ordered a competency evaluation pursuant to 18 U.S.C. § 4241(a) and determined whether he was competent to proceed. Because the court failed to do so, Yang contends his conviction and sentence should be vacated and a competency hearing should be held before further proceedings occur.

Alternatively, or in addition, Yang contends that the evidence establishes that he likely was not competent to stand trial at the time the proceedings in his criminal case occurred. Citing not

only the same evidence referenced above, but also evidence that was not before the court at the time, Yang argues that he was likely incompetent at the time of the underlying proceedings. For this reason, as well, he contends that his conviction should be vacated. The court will address each kind of competency claim in turn, but it must first address the Government's argument that Yang has procedurally defaulted any competency claim.

## A. Procedural Default

The Government argues that Yang's claim is procedurally defaulted because it was not raised in the trial court or on direct appeal. Collateral relief under § 2255 is not a substitute for a direct appeal. "A claim not raised on direct appeal generally may not be raised for the first time on collateral review and amounts to procedural default." *White v. United States*, 8 F.4th 547, 554 (7th Cir. 2021) (citing *McCoy v. United States*, 815 F.3d 292, 295 (7th Cir. 2016)); *see also Delatorre v. United States*, 847 F.3d 837, 843 (7th Cir. 2017) ("Any claim that could have been raised originally in the trial court and then on direct appeal that is raised for the first time on collateral review is procedurally defaulted."). In pressing its argument for procedural default, the Government does not distinguish between Yang's procedural and substantive competency claims. Yang, for his part, contends that neither claim is subject to procedural default under Seventh Circuit precedent.

In this respect, Yang's argument differs from the Eleventh Circuit precedent on which he relies to distinguish between procedural and substantive competency claims. The Eleventh Circuit has held that procedural competency claims are waived if not raised on direct appeal. *Battle*, 419 F.3d at 1298 ("Because Battle failed to raise this [procedural competency] claim on direct appeal, he has waived it." (citations omitted)). As to substantive competency, however, the Eleventh Circuit has held that such a claim "is not subject to procedural default and must be considered on

7

the merits." *Id.* (citing *Medina*, 59 F.3d at 1111). In his response to the Government's argument that he procedurally defaulted his claim under the circumstances of this case, Yang seems to have overlooked the role of counsel in representing a criminal defendant, as well as counsel's obligation to the court.

As an initial matter, Yang asserts that the procedural default rule does not apply to the issue of competency asserted here because it is "not a 'claim' in the classic sense of the word." Case No. 21-CV-1281, Dkt. No. 43 at 19. He argues that competency is an issue the court can raise *sua sponte* if defense counsel or the Government does not raise it first. *See* 18 U.S.C. § 4241. But the fact that the court can raise the issue does not mean that the assertion that the court erred in failing to do so is not a claim. Yang does, in fact, assert a claim—that the court's failure to hold a competency hearing violated his right to due process. Yang has not shown how his due process claim is different than any other constitutional claim subject to the rule of procedural default. Of course, the defendant himself would not be expected to raise the issue, especially if he's not competent to stand trial. But just like any other claim, the attorney representing him, either at trial or on appeal, would be expected to do so. The issue, then, is whether Yang, through his attorney, procedurally defaulted his due process claim.

Yang asserts that, under the Seventh Circuit's decision in *Anderson v. United States*, 865 F.3d 914 (7th Cir. 2017), due process competency claims are not subject to procedural default. The petitioner in that case pled guilty to being a felon in possession of a firearm. His plea agreement prevented him from directly appealing his conviction and sentence, so the petitioner filed a § 2255 motion asserting that he was not competent at the time of his guilty plea and that his counsel provided constitutionally defective assistance for failing to challenge his competence. After the district court summarily denied his § 2255 motion, the petitioner appealed and requested

an evidentiary hearing to develop the facts relevant to his interrelated claims. *Id.* at 915. The court of appeals agreed that an evidentiary hearing was necessary and remanded the case for further proceedings. *Id.* at 922. In so ruling, however, the court focused on the due process claim and did not address the issue of procedural default. Contrary to Yang's suggestion, the court did not hold that such claims are categorically exempt from the procedural default rule. Yang has not cited, and the court cannot find, any cases from the Seventh Circuit adopting such an exception.

Yang also argues that his due process claim could not have been raised on direct appeal because it relies on extrinsic evidence. He analogizes his due process claim to a claim of ineffective assistance of counsel, for which the record is generally not fully developed until trial counsel testifies on collateral review. *See, e.g.*, *Galbraith v. United States*, 313 F.3d 1001, 1007 (7th Cir. 2002) ("A reviewing court on direct appeal is limited to the record of trial and cannot consider any extrinsic evidence."). The Seventh Circuit recently addressed the "extrinsic evidence" exception in *Delatorre v. United States*, 847 F.3d 837 (7th Cir. 2017). Although the Seventh Circuit did not address the precise issue presented here, the case is nevertheless instructive.

In *Delatorre*, the petitioner filed a § 2255 motion asserting, among other things, that the prosecutor engaged in misconduct by reneging on a promise to provide him with a plea agreement. *Id.* at 843. Because the petitioner did not assert his prosecutorial misconduct claim in the district court or on direct appeal, the court concluded the claim was procedurally defaulted. To establish cause for his default, the petitioner argued that, like most claims of ineffective assistance of counsel, his prosecutorial-misconduct claim was so "inextricably linked to extrinsic evidence that it could not have been properly considered on direct appeal." *Id.* at 844. The court rejected the petitioner's analogy to an ineffective assistance of counsel claim. It explained:

The evidence introduced at trial in the case giving rise to the claim of ineffective assistance . . . will be devoted to issues of guilt or innocence, and the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis. Thus, claims of ineffective assistance, by their very nature, are almost invariably doomed on direct review because they often require augmentation of the record with extrinsic evidence, which cannot be considered. We thus permit these claims, in most instances, to be raised for the first time on collateral review.

*Id.* (internal citations omitted) (cleaned up). In other words, the evidence necessary to prove ineffective assistance of counsel will rarely be introduced in the underlying criminal case by the very attorney whose representation is alleged to have been deficient. That's why the record must generally be augmented to allow for review of such claims.

Conversely, the *Delatorre* court observed that the prosecutorial-misconduct claim petitioner was asserting in that case "does not, by its very nature require augmentation of the record." *Id.* "The only reason extrinsic evidence is required to prove [Delatorre's] claim," the court explained, "is because *he* [or his attorney] failed to raise this claim in the district court in the first place." *Id.* The court noted that "[h]ad he [or his attorney] raised this claim at the proper time—in the district court before he was convicted—his evidence supporting that claim would have been in the trial record and could have been considered on direct appeal." *Id.* The court concluded, "[Delatorre's] prosecutorial misconduct claim is not akin to an ineffective-assistance-of-counsel claim in this regard, and we refuse to reward [him] for *his* creation of an evidentiary issue." *Id.* It should be noted, however, that the court did allow Delatorre to assert an ineffective assistance of counsel claim based on his attorney's failure to seek enforcement of the alleged plea agreement.

The rationale of *Delatorre* applies here. If the need for a competency evaluation was so obvious that the trial court should have raised the question of Yang's competency *sua sponte* and ordered an evaluation, then it clearly should have been raised in the trial court and/or on direct

10

appeal. Whatever notice the trial court had of the defendant's potential incompetence would have been reflected in the record as it then existed and could have been offered in support of Yang's due process claim on appeal. Having failed to appeal, Yang has waived at least his procedural claim that he was denied due process by the court's failure to *sua sponte* order a competency evaluation in the underlying proceeding.

Like Delatorre, Yang has attempted to avoid this result by seeking to augment the record in a § 2555 proceeding with evidence that was not before the court in the original case. Yang attached to his amended petition, for example, a copy of an email that U.S. Probation Officer Brian Koehler had written to Attorney Phillip shortly after Attorney Phillip had taken over the case. A portion of the email reads:

> I "sort of" had the presentence interview. It did not go well. Mr. Yang stated he could not recall even the most basic of information about his background or upbringing; had an impossible time with names, dates, and places; and generally knew nothing about himself or his family.

Case No. 21-CV-1281, Dkt. No. 31-1. Along the same line, Yang called Officer Koehler as a witness at his evidentiary hearing. Officer Koehler testified that, during the presentence interview, Yang "was struggling to recall many aspects of his life to include his name and date of birth." Case No. 21-CV-1281, Dkt. No. 42 at 18:09–10.

More importantly, Yang also offered testimony from Dr. Johnson, who had earlier evaluated Yang and testified at Yang's trial on the issue of insanity. Dr. Johnson testified for the first time at the evidentiary hearing on Yang's § 2255 motion that, in his opinion, Yang was likely not competent to stand trial at the time of the previous criminal proceedings. *Id.* at 27:18–21. Although he had doubted Yang's competency at the time of the earlier trial, Dr. Johnson explained that the neuropsychological evaluation that he performed on Yang in the spring of 2020 was focused on insanity, not competency, and he therefore did not believe it appropriate for him to

11

opine directly on Yang's competency. And despite his doubts about Yang's competency at the time of his earlier evaluation, Dr. Johnson testified he did not believe he mentioned it to Attorney Phillip, who had retained him to conduct the evaluation. *Id.* at 46:12–47:03.

But, of course, this evidence was not before the court in Yang's original case. To the extent Yang relies on this newly presented evidence to support his claim that the court deprived him of due process by failing to conduct a competency hearing, the claim fails because that evidence was not part of the record before the court. The court cannot have erred in failing to consider evidence that was not before it. If, on the other hand, Yang's claim now is that this or similar evidence should have been presented in the earlier proceedings, his claim is really one for ineffective assistance of counsel. However, Yang has withdrawn his claim of ineffective assistance of counsel in an obvious effort to shield himself from any damaging evidence on the very issue on which he now claims he is entitled to relief. In doing so, Yang has also waived his substantive competency claim.

It is, after all, the defendant's own attorney, not the attorney for the Government or the trial court, that is in the best position to evaluate his client's competency to proceed—his ability "to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). It is the defendant's attorney, whether retained or appointed, who directly interacts with the defendant during the course of the representation, explains to his client the applicable law and procedure, and works with the client in preparing the defense. Lack of competency to proceed is an absolute bar to trial and conviction. An attorney who fails to raise a meritorious competency issue is constitutionally ineffective. Thus, the fact that neither of Yang's previous attorneys raised the issue of his competency to proceed strongly suggests that neither saw any reason to question it. Yet, when the Government sought to elicit testimony from Attorney

12

Phillip at the hearing on Yang's § 2255 motion, Yang objected on the ground of attorney-client privilege. When the court stated it would order Attorney Phillip to testify concerning his former client's competence to stand trial over Yang's objection, Attorney White requested that the court's order be stayed so that she could appeal. Case No. 21-CV-1281, Dkt. No. 42 at 14:21–15:07. The court granted Attorney White's request for a stay and proceeded with the evidentiary hearing rather than delay the case further. *Id.*

The court remains convinced, however, that it was entitled to hear from Yang's previous attorneys on both the procedural and substantive competency claims on which he seeks relief. Just as an individual waives the attorney-client privilege by asserting a claim of ineffective assistance of counsel, so also the privilege is waived when a defendant claims he was incompetent. Both claims require the disclosure of otherwise confidential information for their resolution. The attorney-client privilege cannot be used to shield from the court facts showing a bona fide doubt as to a defendant's competency to stand trial. *See United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir. 1984) ("Counsel is not relieved of his obligation to bring to the court's attention facts showing a bona fide doubt as to the defendant's competency by claiming that the information was received in confidence. A defendant cannot hope to avoid trial by claiming incompetence and at the same time refuse to divulge the basis for his claim. This remains true whether defendant is attempting to establish incompetence or only a bona fide doubt on that score."). No court should countenance such gamesmanship. Yang's withdrawal of his ineffective assistance of counsel claim and assertion of privilege under these circumstances constitute a further basis for concluding that not only his procedural competency claim, but also his substantive claim, are waived.

In sum, by failing to raise the issue of his competency to stand trial in court or on direct appeal, and now by withdrawing his ineffective assistance of counsel claim and barring crucial evidence on the issue by asserting his attorney-client privilege, Yang has procedurally defaulted both his procedural and substantive competency claims. "Procedurally defaulted constitutional claims are not considered on collateral review unless the petitioner shows either (1) actual innocence or (2) cause and prejudice." *Delatorre*, 847 F.3d at 843. Yang does not advance any argument of actual innocence or that he has cause for his procedural default. As a result, the claim is barred and, for this reason alone, his petition must be denied. Nevertheless, in the interest of making a full record, the court proceeded with the hearing Yang had requested. Having considered the evidence offered and the entire record in the underlying case, the court also concludes that Yang's procedural and substantive claims fail on the merits.

## B. Procedural Competence Claim

It is well settled that "the criminal trial of an incompetent defendant violates due process." *Medina v. California*, 505 U.S. 437, 453 (1992). Federal law requires that a court order a hearing to determine the competency of a defendant, either *sua sponte* or on either parties' motion, "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). Yang claims that he was denied due process of law as a result of the failure of the Government or the court to raise the issue of his competency, request an evaluation, and determine whether he was competent to proceed in his underlying criminal case, even though his own attorney never raised the issue. "Failing to *sua sponte* hold a competency hearing violates due process if, but only if, 'there is a bona fide doubt that arises as to a defendant's competency

before trial.'" *United States v. Stoller*, 827 F.3d 591, 596 (7th Cir. 2016) (quoting *United States v. Woodard*, 744 F.3d 488, 493 (7th Cir. 2014)). A decision whether to order a competency evaluation *sua sponte* is entrusted to the district court's sound discretion. *Id.*

In the underlying case, the court had no reason to believe Yang had a mental disease or defect of such severity that he was unable to understand the nature or consequences of the proceedings against him or assist his attorneys in his defense. Although the brazenness of the crimes alleged and Yang's stated reason for committing them seemed bizarre, Yang appeared to be functioning within normal limits at the time. According to the Pretrial Services Report filed with the court just before his initial appearance, Yang conveyed to the author of the Report that he was born on December 29, 1999, to Yer Lee and Chao Yang. He had four brothers and four sisters, each of whom he named and each of whom lived in the Eastern District of Wisconsin. Yang stated he lived with his parents, his younger sister, and Aimee Thao, his fiancé/wife, at the Appleton home in which he had grown up. Yang stated he and Ms. Thao were expecting their first child in October of that year. He was able to speak fluently in English and Hmong. Case No. 19-CR-67, Dkt. No. 4 at 1–2.

The employment history Yang gave included working three months during the winter of 2018 as a machine operator at Agropur, a cheese factory in Appleton, as a cashier/customer service representative at Advanced Auto Parts in Appleton during the summer of 2018, as a line worker for LCS Communications in Menasha in the Spring of 2018, and as a busser/host at Basil Café in Appleton. He had earned wages at these jobs ranging from $8.50 to $14.00 per hour. Yang stated his left each of these jobs because of mental health related stress. *Id.* at 4. He held a valid driver's license, owned a motor vehicle, and had a mobile phone. Although he appeared to be indigent,

15

Yang indicated that he had retained Attorney Kevin Musolf from an Appleton law firm to represent him in future court proceedings. *Id.*

Yang denied any history of substance or alcohol abuse. As for his mental health history, the Pretrial Services Report explained:

> The defendant reported having some learning disabilities and has had difficulty being able to focus. He further reported bouts of stuttering and uncontrollable twitches. He related he stopped taking his medications in the seventh grade because he wanted to be "normal" like all of the other kids. He stated he now meditates to calm himself but feels that he is going "crazy." He advised hearing voices when he is day dreaming or when he doesn't get enough sleep. He further noted he would like to return to the doctor to see about getting back on his medications but feels a certain level of guilt over this as he does not want to burden his parents. Mr. Yang was unable to recall the names or types of medications he was previously prescribed. No gambling history was noted.

*Id.* at 5.

The first suggestion that Yang's mental condition might be more severe came with the October 10, 2019 psychological evaluation conducted by Dr. Berney in response to Yang's notice of insanity defense. Case No. 19-CR-67, Dkt. No. 13. Dr. Berney had interviewed Yang on June 29 and July 3, 2019. Yang reported to Dr. Berney he had a "very compromised memory" which he seemingly attributed to a head injury that had occurred at work sometime in December 2018. Following his head injury, Yang claimed he was unable to recall significant personal information, including his date of birth, where he was born, the number of siblings he had, where he lived, who he lived with, where he had attended school, and his employment history. *Id.* at 1, 3. He also claimed he could not recall any information relating to the crimes with which he was charged. Yang told Dr. Berney that he could "only remember sleeping on the couch and then [he] woke up in the Outagamie County Jail." *Id.* at 10.

Yang also reported having experienced auditory hallucinations following a head injury he sustained in December 2018 at the cheese factory where he was working at the time. Yang claims

16

he was struck in the head with a "cheese pusher" and "blacked out a little bit," vomited, went home, and remained off work for one or two weeks. *Id.* at 3–4. Dr. Berney was unable to determine from Yang's report of the incident whether Yang had a loss of consciousness, but it was clear Yang neither sought nor received medical treatment. One or two weeks after he returned to work, Yang claims that he left his employment because of "headaches and hearing someone talking to me, demons' voices." *Id.* at 4. He went on to state that, since the head injury, he was unable to recall any information and had significant headaches. He claims he was having bad dreams, would black out and have headaches in his dreams. *Id.* Sometimes, the voices threatened that, if he did not do what they wanted him to do, they would scare him at night. *Id.* at 5.

Though Yang's claimed extreme lack of recall and auditory hallucinations may suggest a severe mental disease or defect, Dr. Berney's report also contained strong evidence that Yang was malingering. Dr. Berney noted that Yang's claimed inability to remember his personal circumstances was inconsistent with the Pretrial Services Report which showed a clear memory of the same information he now claimed he could not recall. *Id.* at 3, 12. Dr. Berney also noted that Yang's claimed lack of memory concerning the circumstances surrounding his alleged crimes was inconsistent with the reports of the arresting officer and Detective Probst who interviewed him after his arrest. *Id.* At 10–11. Dr. Berney noted in his report that "it is unlikely that Mr. Yang would have the capacity to initially recall specific details of the alleged robbery and subsequently have absolutely no recall at all of any of the incidents related to the robbery." *Id.* at 12. Based upon his clinical experience, review of literature and consultation with a neuropsychologist, Dr. Berney also observed that "auditory hallucinations are an extremely rare sequelae associated with a closed head injury." *Id.* at 13. As a result, Dr. Berney concluded that Yang's "expressed symptoms of auditory hallucinations are likely feigned or exaggerated. *Id.* at 14.

17

Psychological testing also indicated clear signs of malingering. Dr. Berney administered to Yang the Test of Memory Malingering (TOMM), a standardized measure that is used to assess feigning memory defects. According to Dr. Berney's report, "Mr. Yang's scores on the TOMM on both the first and second administration were in what would be considered the definitively malingering range." *Id.* at 9. The fact that Yang's scores on both trial one and two were below chance, "demonstrates an apparent attempt to feign memory deficits." *Id.*

Notwithstanding this clear evidence that Yang was malingering and/or exaggerating his symptoms, Dr. Berney concluded from other psychological testing he had done, previous psychological testing done by Dr. Linda Steffen of Yang from when he was a child, and information provided by Yang and his fiancé/wife, that he had significant memory difficulties as well as "a possible neurological anomaly." *Id.* at 14. And while Dr. Berney thought that Yang presented a number of complicated symptoms that may constitute a mental defect, he nevertheless concluded that Yang did appreciate the wrongfulness of his acts.

As for his competence to proceed, neither Dr. Berney, nor Attorney Musolf, who was representing Yang at the time, suggested that Yang did not understand the proceedings or was unable to assist in his own defense. In fact, when Dr. Berney's report failed to support Yang's insanity defense, Attorney Musolf proceeded to negotiate a plea agreement on Yang's behalf in which Yang would plead guilty to the charges of bank robbery and brandishing a firearm during and in relation to a crime of violence. Yang signed the Agreement, and Attorney Musolf asked that the case be set for a change of plea hearing. Case No. 19-CR-67, Dkt. No. 15.

As in most cases, the change of plea hearing was the court's first opportunity to directly address the defendant at length. At the beginning of the hearing, the court expressly asked Attorney Musolf if he had any doubts about his client's ability to proceed. Attorney Musolf

18

responded, "No, I do not." Case No. 19-CR-67, Dkt. No. 55 at 3:04–06. Attorney Musolf also stated he had sufficiently and satisfactorily investigated the insanity defense and fully discussed it with Yang. *Id.* at 3:07–13. Having discussed all of the facts and circumstances of the case and gone over the plea agreement and the discovery materials with him, Attorney Musolf advised the court that, if Mr. Yang proceeded to waive his rights and enter guilty pleas to the two charges as contemplated by the Agreement, those would be knowing and voluntary decisions on his part. *Id.* at 3:19–22. When Yang then acknowledged that it was his intention to waive his rights and enter pleas of guilty pursuant to the agreement he had signed, the court proceeded to question him further under oath. *Id.* at 4:21–5:09.

In the course of the plea colloquy, Yang provided personal background information in response to the court's questions. He also acknowledged that he had read over and signed the written Plea Agreement after discussing it with his attorney and having any questions he had answered by his attorney. Although he stated he was no longer getting the medication that had been prescribed for the voices and memory loss, the voices had for the most part stopped and they did not interfere with his ability to talk with Attorney Musolf and understand his case. *Id.* at 10:06–20. The court then went over the elements of each offense and the potential penalties. When asked if he understood, Yang responded that he did. He also acknowledged that, by pleading guilty, he was giving up or waiving his right to a jury trial. *Id.* at 11:02–14:10. Yang stated he knew what a jury trial is and when asked to tell the court in his own words what a jury trial is, Yang responded: "Jury trial is when there's people from outside that comes in and testifies or like to see if you're guilty or not guilty." *Id.* at 16:08–18. The court confirmed that, at a jury trial, witnesses testify but explained that, at a jury trial, the jury is the factfinder and decides whether the Government has proven the defendant's guilt beyond a reasonable doubt. *Id.* at 16:19–24. The court then

19

proceeded to explain in detail the rights Yang was giving up by entering his guilty plea and asked Yang if he had any questions about those rights. Yang responded, "No." *Id.* at 16:25–18:18.

At the conclusion of the colloquy, Yang entered his pleas of guilty as to each of the two counts contemplated by the Agreement and confirmed the Government's summary of the evidence as a factual basis for his pleas. The court then asked Yang why he committed those crimes. Yang responded:

> I was -- that day I was playing a video game. So after my head injury, I wasn't sure what was going on. I was confused of everything, and I just thought that things that was wrong were right. After playing the video game, I just thought that I was in the video game, and I went to go rob a bank.

*Id.* at 20:12–18. The court then addressed Attorney Musolf, asking if he sufficiently investigated the insanity defense and concluded it is not valid. Attorney Musolf responded, "Yes," noting that Dr. Berney's report was on file and that they agreed Yang's mental condition "doesn't rise to the level of a legal insanity defense despite the fact there are some issues." *Id.* at 20:19–21:01. The court thereupon concluded that Yang had freely and voluntarily waived his rights and entered pleas of guilty on both counts. *Id.* at 21:02–22. In doing so, the court had no doubt as to Yang's competency to proceed.

Additional evidence that Yang understood the proceedings against him and was able to assist in his defense arrived less than three weeks later, on February 6, 2020, in the form of a handwritten letter Yang sent to the court asking that his lawyer be removed and his plea be withdrawn. Case No. 19-CR-67, Dkt. No. 17. In his letter, Yang claimed, contrary to his testimony at the change of plea hearing, that Attorney Musolf had not answered all his questions. Yang denied that Attorney Musolf had discussed Dr. Berney's report with him and stated that, at the time of the change of plea hearing, he lacked focus due to his mental health. Yang further stated that he wanted his lawyer to withdraw because he was ineffective, had ignored his questions by

changing the subject, and had failed to follow up with his brother who had been acting as his guide due to Yang's special needs.  Yang also requested that his plea be withdrawn because "it wasn't voluntary nor intelligent and should be voided because the plea and conviction will be unconstitutional for the reason that the defendant's 6th amendment right is hindering the guarantees of assurings [sic] of a meanful [sic] by not properly going over the Dr. report with courts and the defendant, which is guarantee by law." *Id.*  Following a hearing on Yang's letter, the court granted his request for a new attorney who would then investigate the question whether there were grounds to withdraw his plea.

As noted above, Attorney Musolf was then replaced by Attorney Phillip, who, after having a neuropsychological evaluation done by Dr. Johnson, filed a motion to withdraw Yang's guilty pleas and reinstate his plea of not guilty by reason of insanity.  Case No. 19-CR-67, Dkt. No. 27. Although Dr. Johnson did not disagree with Dr. Berney's findings as to Yang's malingering, he concluded that "[t]he possibility that Mr. Yang may be feigning memory problems and exaggerating some symptoms to a degree to avoid the consequences of his actions does not take away from the certainty that he was suffering from serious mental impairment at the time of the crime."  Case No. 19-CR-67, Dkt. No. 29 at 36.  Unlike Dr. Berney, Dr. Johnson concluded "to a reasonable degree of certainty that the multiple mental conditions that Mr. Yang was experiencing at the time of the crime seriously impaired his judgment and the ability to appreciate the nature and quality as well as the wrongfulness of his acts." *Id.*

The court granted Yang's motion to withdraw his plea and reset the case for trial.  Shortly before the scheduled trial date, Attorney Phillip filed, on Yang's behalf, a waiver of his right to a jury trial.  Case No. 19-CR-67, Dkt. No. 38.  Further evidence of Yang's competency to proceed is apparent from the transcript of the hearing at which Yang expressly waived his right to a jury

21

trial.  Case No. 19-CR-67, Dkt. No. 63.  Not only did the court have an additional opportunity to

personally address Yang and assess his ability to understand the proceedings, but it also had the

opinion of Attorney Phillip, who had far more extensive involvement with Yang and had discussed

with him the various options he had.  In response to the court's inquiry as to whether he had gone

over the written waiver of right to a jury trial that bore the signatures of counsel and Yang, Attorney

Phillip advised the court:

> Yes, Your Honor. In several meetings with Mr. Yang at the Brown County Jail, we discussed the concept of a court trial. We discussed the logistics of court and jury trials. We discussed the pros and cons of both and given the factual situation in the case and given the withdrawal of the plea and the reinstitution of the insanity defense. Based on all of those things together during our conversations, Mr. Yang has agreed that the trial is one for the Court rather than for a jury.

*Id.* at 3:01–14.  When asked if it was correct that he wished to give up or waive his right to a jury

trial, Yang responded, "Yes, Your Honor."  *Id.* at 3:17.  The court proceeded to question Yang

further to ensure he fully understood the right he was giving up.  *Id.* at 3:18–8:12.  After completing

its questioning of Yang, the court returned to Attorney Phillip and asked if he had any reason to

believe that his client's decision would be affected by any mental illness or lack of understanding

or anything.  Attorney Phillip responded:

> No, I believe that he's competent to make this decision, and we've discussed it at length over several meetings and we've discussed the posture of the case at length over several meetings, so I think he's making a knowing decision and a voluntary decision to waive the jury.

*Id.* at 8:13–21.  Having satisfied itself that Yang's decision was knowing and voluntary, the court

accepted the waiver.

The court trial took place less than two weeks later on October 29, 2020.  After reviewing

the video evidence and listening to the testimony of Drs. Berney and Johnson, the court concluded

that the defense had failed to meet its burden of establishing by clear and convincing evidence that,

at the time of the robbery, Yang was suffering from a mental disease or defect of such severity that he was unable to appreciate the nature and quality or the wrongfulness of his acts. Case No. 19-CR-67, Dkt. No. 61 at 102:02–04. In reaching this conclusion, the court relied primarily upon the video of the interview Detective Probst had conducted of Yang shortly after his arrest, which neither of the psychologists seemed to have watched or given much weight. In the course of that interview, Yang acknowledged in detail what he had done and why. He said that he decided to try something new today, so he robbed the bank. He also said he knew the difference between right and wrong and that bank robbery was illegal. The court found it "clear from watching the interview that whatever intellectual deficits Mr. Yang has, they are not significant as a functional matter." *Id.* at 99:02–04. The court noted that Yang was able to communicate with Detective Probst, he understood the questions and gave responsive answers. He understood his rights as Detective Probst read them to him and asserted his right not to answer questions that he did not wish to answer. He made no mention of any head injury and denied any history of serious mental illness. He also stated he understood the consequences of his behavior, that it was serious, and that he would be going to jail. Case No. 19-CR-67, Trial Ex. 4 at 7:57–8:02.

Nothing that occurred after the trial caused the court to question whether Yang remained competent to proceed. Although the Presentence Investigation Report noted that Yang had "remained steadfast in his claim of a compromised memory of the events of the instant offense," it also observed that he had given statements to law enforcement following his arrest in which he "provided a detailed description of his conduct, as well as the reasoning for some of his actions." Case No. 19-CR-67, Dkt. No. 45, ¶ 33. The same was true concerning personal information about his family and background. *Id.* ¶¶ 64, 82. His brother Michael described Yang as "an honest, respectful, and responsible individual who had 'no interest in illegal things' and a firm

understanding between right and wrong." *Id.* ¶ 72. Michael confirmed Yang's "long history of comprehension issues . . . but advised such issues have never caused him to disregard the law or put the safety of others in jeopardy." *Id.* Michael regarded his brother as "a relatively normal person." *Id.* The Presentence Report also summarized the reports of the various psychological evaluations described above that had been conducted on Yang. *Id.* ¶¶ 79, 80, 81, 83, 84.

Based on the foregoing, the court is satisfied that it did not err in failing to *sua sponte* order a competency evaluation pursuant to 18 U.S.C. § 4241(a). Nothing in the proceedings led the court to believe that Yang was suffering from a mental disease or defect that rendered him mentally incompetent to the extent that he was unable to understand the nature and consequences of the proceeding or assist in his defense. In both the plea colloquy the court conducted with Yang when he entered his guilty plea in January of 2020 and the colloquy it conducted in October when he waived his right to a jury trial, Yang personally acknowledged that he understood the proceedings and the rights he was relinquishing. His attorneys at each proceeding, both of whom had well over twenty years of experience in representing defendants in criminal cases, affirmed that, based on their own discussions and interactions with Yang, they believed he was competent to proceed. Even Yang's letter requesting the removal of Attorney Musolf and to withdraw his plea reflects a clear understanding of the nature and consequences of the proceedings.

It should also be noted that neither of the psychologists who performed evaluations of Yang to determine his sanity at the time he committed the crimes suggested in their reports or testimony at trial that Yang lacked such competency. Indeed, both diagnosed him as having at most only mild intellectual deficits. Case No. 19-CR-67, Dkt. No. 13 at 9; Case No. 19-CR-67, Dkt. No. 29 at 31. Both also concluded Yang was malingering or feigning his symptoms to some degree, which

24

would seem in itself evidence that he understood the nature and consequences of the proceedings. Why fake or exaggerate your symptoms if you don't understand the consequences?

In light of the record before the court in the underlying criminal proceeding, the court concludes that even if it was not waived, Yang's procedural competency claim would fail. A bona fide doubt did not arise as to Yang's competency before, at, or after his trial. The court will now turn to Yang's substantive competency claim.

### C. Substantive Competency Claim

Yang also claims, based on evidence not before the court in the underlying criminal proceedings, that he was, in fact, not competent at the time of his trial. This is what the Eleventh Circuit has referred to as a substantive competency claim. *Medina*, 59 F.3d at 1106. To prevail on a substantive competency claim in a § 2255 proceeding, it is not enough to show merely that there is reason to question whether the petitioner was competent. "In contrast to a procedural competency claim, . . . 'a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence.'" *Id.* (quoting *James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir. 1992).

In an effort to meet this burden here, Yang offered the above-described testimony of U.S. Probation Officer Koehler and Dr. Johnson. *Supra* at 11. Yang cites the fact that Officer Koehler was unable to complete his presentence interview with Yang because of his inability to recall biographical and background information. Yang also cites Officer Koehler's testimony that he "struggled to recall many aspects of his life to include his name and date of birth," Case No. 21-CV-1281, Dkt. No. 43 at 4, as clear evidence of his incompetency.

Notwithstanding Officer Koehler's use of the word "struggled," however, there is no evidence to suggest that Yang's claimed inability to recall such information was genuine. Officer

Koehler noted in the Presentence Report that Yang's claimed inability to recall such basic information stood "in complete contrast to the defendant's admissions at the time of his arrest, or the information Yang was able to provide during his pretrial interview, during which he was cited as being lucid and knowledgeable about his family and background information." Case No. 19-CR-67, Dkt. No. 45, ¶ 82. Officer Koehler also noted in the Presentence Report that both psychologists who evaluated him found that he was likely feigning memory problems and exaggerating some of his symptoms. *Id.* at ¶¶ 81, 84. Officer Koehler's testimony at the evidentiary hearing offers little that was not already before the court. Feigning memory deficits does not constitute evidence of mental incompetence.

Yang places great weight upon the testimony of Dr. Johnson at the evidentiary hearing on his § 2255 motion. As noted above, Dr. Johnson testified that, based on his 2020 neuropsychological evaluation of Yang and records he had reviewed since then, he believed that it was "very likely that [Yang] was incompetent to stand trial during that time period." Case No. 21-CV-1281, Dkt. No. 42 at 27:10–11. Dr. Johnson based his opinion on Yang's low IQ scores, the head injury he sustained several months before the bank robbery, his own interviews with Yang, jail records, Yang's academic functioning, his memory deficits, his accounts of hearing voices, and Dr. Johnson's review of court records, including transcripts of hearings. Although he performed no competency evaluation himself, Dr. Johnson concluded in his supplemental report "that there was reason to believe that during the time period of the court proceedings Mr. Yang may have been incompetent to stand trial." Case No. 21-CV-1281, Hearing Ex. 3 at 9.

Having considered his testimony and report, the court does not place significant weight on Dr. Johnson's opinion. The fact that Dr. Johnson is qualified as an expert to offer an opinion does not mean that the finder of fact is required to accept it. *See* Federal Civil Jury Instructions of the

Seventh Circuit No. 1.21. In light of the entire record in this case, the court does not find Dr. Johnson's opinion as to Yang's competence during the relevant time credible. The court reaches this conclusion for several reasons. First, Dr. Johnson, by his own admission, never conducted a competency evaluation. He never asked Yang whether he understood the proceedings, the role of the judge, prosecutor, and defense attorney, or how a trial is conducted. Nor did he speak with the two experienced attorneys about their view of whether Yang had a reasonable understanding of such matters or whether he was able to assist in his own defense. He apparently did not even consider the opinions they expressed at the change of plea and jury waiver hearing. Both attorneys expressed the view, at least implicitly, based on their own discussions with Yang about the case and his defense, that Yang was competent to proceed.

It also appears that Dr. Johnson agreed with Dr. Berney that Yang was likely feigning memory loss and exaggerating symptoms. Yet, Dr. Johnson seemed to take Yang's account of what he experienced and remembered at face value, attributing the unusual symptoms claimed to a mysterious head injury allegedly sustained at work some three months before the robbery for which no medical treatment was ever sought or provided. He accepted Yang's account even though Yang had recounted the very facts and details he now claimed he could not recall both to Detective Probst at the time of his arrest and to the author of the Pretrial Services Report shortly after he was indicted. Dr. Johnson ignored the fact that Yang's memory loss and symptoms, for the most part, only increased when he realized the substantial prison terms his crimes carried.

Dr. Johnson also seemed to have primarily relied on various tests and instruments that are intended to measure an individual's functional capacity, yet virtually ignored the most direct evidence of Yang's functional capacity—namely, his hour-long interview with Detective Probst shortly after his arrest in which he spoke at length and lucidly about what he had done and why.

27

Case No. 19-CR-67, Trial Ex. 4. As the court noted in rejecting Dr. Johnson's opinion on the insanity defense at the trial, it seemed "clear from watching the interview that whatever intellectual deficits Mr. Yang has, they are not significant as a functional matter." Case No. 19-CR-67, Dkt. No. 61 at 99:02–04. The court reaches the same conclusion here. Based on the entire record before it, the court finds that Yang was competent at the time of the proceedings in the underlying case.

## CONCLUSION

In sum, based on the entire record in this matter, the court is satisfied that Yang was able to understand the nature and consequences of the proceedings and to assist properly in his defense during the relevant time period. Accordingly, his § 2255 motion is denied and the case is dismissed. The Clerk is directed to enter judgment dismissing the case. The court will nevertheless grant a certificate of appealability on the issue set forth above. Although the court has concluded that Yang is not entitled to relief, it also finds that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 580 U.S. 100, 115 (2017) (internal quotation marks and citation omitted).

**SO ORDERED** at Green Bay, Wisconsin this 31st day of July, 2023.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

28